IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RANDY GOLDEN,

    Plaintiff,

    v.

GREGORY WERNER, *Acting Warden*,
JEREMY M. CRITES, *Correctional Officer*,
JEFF NINES,
RICHARD S. RODERICK,
SUSAN  M. JOHNSON,

    Defendants.

Civil Action No.:  RDB-20-2480

**MEMORANDUM OPINION**

Self-represented Plaintiff Randy Golden, an inmate at a state prison facility, brought this civil action pursuant to 42 U.S.C. § 1983 against Gregory A. Werner, the acting Warden of North Branch Correctional Institution ("NBCI"), located in Cumberland, Maryland and NBCI Correctional Officer Jeremy M. Crites, asserting violations of his constitutional rights arising from Defendants' alleged failure to follow appropriate protocols to prevent his exposure to COVID-19 and in securing cell doors with shackles and zip ties. ECF No. 1. Thereafter, Golden filed an amended Complaint (ECF No. 12) naming Jeff Nines, Richard S. Roderick, and Susan M. Johnson as additional Defendants and alleging that his constitutional rights were violated when he was held on administrative segregation without the ability to earn diminution of confinement credits.  As relief, he seeks monetary damages and injunctive and declaratory relief.  ECF No. 1 and 12.

On March 29, 2021, Defendants Warden Jeffrey Nines, Richard Roderick, Susan M. Johnson, Acting Assistant Warden Gregory Werner, and Lt. Crites filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment supported by numerous exhibits.  ECF No. 23. On April 12, 2021, Golden filed a response in opposition.  ECF No. 25.  Also pending are Golden's

Motions for Preliminary Injunction (ECF Nos. 27 and 29) to which Defendants have responded (ECF Nos. 31 and 33). A hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons explained below, the Court will DENY Golden's pending motions and GRANT Defendants Warden Jeffrey Nines, Richard Roderick, Susan M. Johnson, Acting Assistant Warden Gregory Werner, and Lt. Crites' Motion.[1]

Accordingly, summary judgment is entered in favor of Defendants Warden Jeffrey Nines, Richard Roderick, Susan M. Johnson, Acting Assistant Warden Gregory Werner, and Lt. Crites and against Golden as to Golden's claims regarding the March 2020 cell search and his assignment to administrative segregation. Golden's claims concerning violation of Defendants' own policies, malfunctioning cell doors, and COVID protocols unrelated to the March 2020 cell search, ARE DISMISSED without prejudice for failure to exhaust administrative remedies.

### Background

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). The Court may consider only such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *Sec'y of State for Defense v. Trimble Navigation Ltd*., 484 F.3d 700, 705 (4th Cir. 2007).

**A.     Golden's Allegations**

1.     COVID-19 exposure

---

[1] Defendants' dispositive submission will be treated as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered. *See Bosiger v. U.S. Airways*, 510 F. 3d 442, 450 (4th Cir. 2007).

Golden alleges that on March 18, 2020, while he was assigned to Housing Unit ("HU") 1, a "mass shake down" was conducted during which correctional staff did not wear face masks or follow social distancing guidelines thus putting him at risk of being exposed to the COVID-19 virus.  ECF No 1, p. 4.  Golden states that while masks were given to Maryland prisons on March 12, 2020, he did not receive a face mask until April 15, 2020.  *Id*.  He claims that correctional staff did not begin wearing face masks until April 4, 2020.  *Id*.

Golden states that the entire inmate population was tested for COVID-19 from June 15 to June 17, 2020, with him being tested on June 16, 2020.  ECF No. 1. p. 4.  On June 19, 2020, Defendants Werner and Crites directed another shake down of Golden's housing unit, which he again claims placed him at risk of exposure to the COVID-19 virus.  *Id*., p. 5.  Inmates on his tier received positive test results on June 19, 2020, "during the shake down."  ECF No. 1, p. 5.

Additionally, on June 22, 2020 "many [NBCI] inmates" tested positive for COVID-19 and on that date, the inmates who tested positive, as well as inmates who refused to be tested, were escorted to HU 2-C tier.  ECF No. 1, p. 5.

On June 24, 2020, Golden was placed in a cell that had "not to[o] long ago" housed a COVID-19 patient.  ECF No. 1, p. 5.  A few days after the COVID-19 positive inmates were moved to HU 2-C tier, inmates from that tier were brought to HU 1-A tier where Golden was then housed.  *Id*., pp. 5-6.

2.      Malfunctioning cell doors

Golden states that on August 4, 2020, he was placed on the recreation and shower list for HU 1-A tier.  ECF No. 1, p. 6.  He states that he was "place[d] in a cage on C-tier rec hall, because Housing Unit 1 A-tier doors was messed up."  *Id*.  The following day maintenance tried to repair the doors and Golden was returned to his cell.  *Id*.  Werner and Crites directed staff to place zip tie

3

restraints on the tier doors in HU 1-A and B tiers.  *Id*.  Subsequently Werner and Crites directed

staff to use ankle shackles to secure the doors in HU 1-A and B tiers.  *Id*.  Golden states that he

remained in a cell that used zip ties and ankle shackles to secure the door from August 5-12, 2020.

*Id*., p. 7.

       3.      Assignment to Administrative Segregation

On December 17, 2020, Golden was moved from HU 1 to HU 2, so that the cell doors in

HU 1 could be fixed.  ECF No. 12, p. 3.  Golden has been on administrative segregation since

August 1, 2019.  Golden states that since May 30, 2020, his requests to be reassigned from

administrative segregation to general population have been denied by Defendants Nines, Roderick,

and Johnson.  *Id*., p. 3. While housed on administrative segregation Golden cannot earn good

conduct credits.  *Id*.  Golden was advised that he could not be assigned to HU 2 because of an

inmate housed in HU 2, however Golden contends that Max II inmates housed in HU 2 do not

come into contact with Max I inmates.  *Id*., p. 3.  On June 3, 2020, Golden asked to be moved to

HU 3 but Johnson declined the request.  *Id*., p. 4.

       4.      Administrative Remedies

On March 18, 2020, Golden filed an Administrative Remedy Procedure ("ARP") which he

claims represented "the facts relating" to this Complaint.  ECF No. 1, p. 7.  The ARP alleged that

he was placed at risk on March 18, 2020 when his cell was searched, and he risked being exposed

to COVID-19.  ECF No. 1-1, p. 2 (ARP NBCI-0608-20).  In support of this complaint, he alleged

he had not been provided a mask and staff were not provided masks or gloves to conduct the cell

search.  *Id*., p. 2.  The grievance was denied and Golden filed an appeal on April 17, 2020, stating

that his grievance was not that his cell was searched during a pandemic, but rather that staff failed

to adhere to "direction and guidelines."  ECF No. 1, p. 7; ECF No. 1-1, p. 5.  On May 11, 2020,

4

the appeal was dismissed. ECF No. 1-1, p. 9. Golden states that he appealed to the Commissioner on June 22, 2020 but received no response. ECF No. 1, p. 7.

Golden filed another ARP on June 26, 2020, concerning "the facts relating to this complaint" which was dismissed. ECF No. 1, p. 7; ECF No. 1-1, p. 13 (ARP NBCI-1245-20). In this ARP, Golden alleged that the NBCI inmate population was tested for COVID-19 from June 15-17, 2020, and that just after the testing occurred a mass shake down was ordered. ECF No. 1-1, pp. 13-14. He claimed that this presented a risk to his health and safety because many inmates had tested positive, and staff did not wait until the results of the tests came back to conduct the shake down. *Id*. at 14. Golden also complained that on June 22, 2020, he was moved into a cell that previously held an inmate who tested positive for COVID-19. *Id*. p. 14.

Golden states that he did not file any additional grievance paperwork because he was housed on administrative segregation and needed to get the forms from correctional staff and the "correctional officer . . . said there aren't any [grievance forms]." ECF No. 1, p. 7. In his opposition response, Golden states that grievance forms were kept in Crites' office and that "If officers cant get in his office, Plaintiff can't get grievance forms." ECF No. 25-1, p. 6.

On November 1, 2020, Golden filed a complaint with the Inmate Grievance Office ("IGO") regarding his assignment to administrative segregation. ECF No. 12, p.4. He did not receive a reply. *Id*.

Golden also provides evidence that he regularly wrote to his case manager and the psychology department regarding his assignment to administrative segregation using "Inmate Request" forms. ECF No. 25-2. Staff responded promptly to Golden's inquiries. *Id*. In none of those inquiries did Golden state that ARPs were unavailable, nor did he ask his case administrator to provide him with ARP forms. *Id*.

B.     **Defendants' Response**

1.  COVID Mitigation

Defendants explain that in response to the COVID-19 pandemic, on March 5, 2020, the

Governor of Maryland issued a state of emergency.  ECF No. 23-3, p. 2. (Governor's Executive

Orders).  The following week the Governor issued an order limiting large public gatherings to 250

people.  *Id*., pp. 3-5.  On March 16, 2020, the March 12th Order was revised to limit large

gatherings in public spaces to 50 people.  *Id*., pp. 6-9.

On March 18, 2020, a mass search of HU 1 was authorized by NBCI Administrators.  The

search was conducted in response to complaints of an increase in smoke on the tiers by both staff

and inmates.  ECF No. 23-4, ¶ 5 (Crites Decl.); ECF No. 23-5, ¶ 5 (Werner Decl.); ECF No. 23-

11, pp. 2-14 (March 18, 2020, mass shakedown memo and log sheets).  The search took place over

all three shifts and all cells and common areas within the housing unit were searched including

Golden's cell.  ECF No. 23-4, ¶ 5; ECF No. 23-11, pp. 41-44.

Crites explains that his duties relative to the search of HU 1 included ensuring a safe and

efficient search as well as the proper processing of documents, including processing contraband

found during the search.  ECF No. 23-4, ¶ 6.  Correctional officers who conducted the search,

began by handcuffing the occupants of each cell through the feed up slot in the door.  ECF No. 23-

4, ¶ 7.  The cell door was opened, and each inmate searched for contraband.  *Id*.  The inmates then

sat in chairs outside of the cell which enabled them to observe the cell search.  *Id*.  After the search

was complete the inmates were placed back in the cell, the door closed and secured, and the

handcuffs removed from each inmate through the door slot.  *Id*.  Staff conducting searches within

the institution are instructed to use disposable exam gloves.  *Id*., ¶ 8.

On March 18, 2020, the Maryland Department of Public Safety and Correctional Service

("DPSCS") Office of Communications and Outreach began to provide "operation Updates" to DPSCS staff regarding adjustment to operations due to the COVID-19 pandemic.  ECF No. 23-4, ¶ 9.  As of March 18, 2020, the date of the cell search, staff had not received any direction on the use of Personal Protective Equipment ("PPE") in response to COVID-19 and therefore were not under orders to use PPE.  ECF No. 23-4, ¶ 10; ECF No. 23-5, ¶ 6.

On March 23, 2020, DPSCS staff received an Operational Update stating that employees were prohibited from reporting to work while wearing a mask, rather if they were sick they were directed to stay home.  ECF No. 23-4, ¶ 11; ECF No. 23-11, p. 15.  The Operational Update further noted that PPE was to be utilized for quarantine and isolation purposes.  ECF No. 23-4, ¶ 11; ECF No. 23-11, p. 15.

On March 31, 2020, DPSCS Directive EMD.DPSCS.055.0012 "Covid-19 Utilization of Protective Equipment and Additional Levels of Protection" regarding the standard use of PPE was made effective.  ECF No. 23-4, ¶ 12; ECF No. 23-5, ¶ 7; ECF No. 23-11, pp. 16-21.  Among other things the directive stated that cloth masks would be provided to staff and inmates.  ECF No. 23-11, p. 18.  Shortly after this directive issued, all staff were issued PPE and directions for its proper use.  ECF No. 23-4, ¶ 12.

Additionally, NBCI staff have received training on the proper wearing and use of PPE and on social distancing.  ECF No. 23-5, ¶ 8.  Correctional staff are required to wear cloth face masks and face shields while in the facility but are not required to wear them in the Officer Dining Room, where they are expected to practice social distancing.  *Id*.  N95 masks are provided to staff, as well as gloves and gowns when they are interacting with an inmate on isolation.  *Id*.  Correctional staff wear gloves during cell searches, pat downs, and during strip searches in special confinement units.  *Id*.

Additionally, as of March 20, 2020, correctional staff are required to practice social distancing at all times while at work.  ECF No. 23-5, ¶ 9.  Defendants explain that NBCI staff follows departmental policy regarding social distancing, use of PPEs, placing personal property in tubs that are cleaned after each use, and no contact searches.  *Id*. Further, personnel are screened and anyone arriving with flu like symptoms or a temperature of 100.4 or above are evaluated and sent home.  *Id*.  Beginning in March of 2020 signage regarding social distancing and hand washing was placed throughout the facility.  *Id*., ¶ 11.

On April 15, 2020, effective April 18, 2020, the Governor issued an Executive Order requiring members of the public to wear face coverings while riding public transportation, or when a customer or staff at a retail or food service establishment.  ECF No. 23-3, pp. 14-17.  The term "Face Covering" as used in the Executive Order meant a covering that fully covers a person's nose and mouth, but did not mean medical grade masks, and included scarves and bandanas.  *Id*., p. 15.

On or about April 15, 2020, washable cloth masks, covering the nose and mouth, began to be distributed to the inmate population and have continued to be distributed as needed.  ECF No. 23-4, ¶ 13; ECF No. 23-5, ¶ 12.  Golden received masks on five occasions, as of the date of Defendant's dispositive motion.  *Id.*

Crites specifically denies ever instructing any staff at NBCI to conduct an institutional search in an unsafe manner on in violation of policy.  ECF No. 23-4, ¶ 14.  Crites further denies having any knowledge of any other staff member conducting an unsafe search or a search in violation of policy.  *Id*.

On June 15, 2020, NBCI began testing the entire inmate population for COVID-19.  ECF No. 23-4, ¶15; ECF 23-5, ¶ 13; ECF 23-11, pp. 22-27.  Testing began on HU 1 on June 16, 2020.  ECF No. 23-4, ¶ 16; ECF No. 23-5, ¶ 14.

On June 18, 2020, an institutional wide search began for a piece of missing contraband. ECF No. 23-4, ¶ 17; ECF No. 23-11, pp. 23-40. The search was undertaken in order to increase the safety of staff and inmates housed at NBCI. ECF No. 23-4, ¶ 17. On June 19, 2020, Golden's cell was again searched for contraband as part of the institution wide search. ECF No. 23-4, ¶ 18. During this search staff were required to wear a surgical or exam mask, a plastic face shield or approved googles, and exam type gloves as part of their PPE. *Id*. Staff were also advised to observe social distancing protocols including remaining six feet from other individuals when possible. *Id*. While the searches were completed, staff attempted to insure six feet of distance was maintained between inmates not assigned to the same cell. *Id*. During this institution wide search, Crites' duties again included ensuring the safe and efficient search of the area and maintenance of documentation, including the processing of any contraband discovered. ECF No. 23-4, ¶ 19.

On June 24, 2020, in response to the growing number of positive COVID-19 cases within the inmate population, HU 2-Tier C was designated as quarantine and isolation location. ECF No. 23-4, ¶ 20; ECF No. 23-5, ¶ 15. Inmates previously housed on HU 2-C Tier were moved to other locations within NBCI. *Id*. Inmates known to be COVID-19 positive, those who refused testing, new transfers to the institution and those pending transfer from NBCI, were all moved to HU 2- C Tier for quarantine or isolation. *Id*.

On June 24, 2020, as part of the COVID-19 related housing moves, Golden was moved from NBCI HU 1-A Tier, Cell 3 to Cell 45. ECF No. 23-4, ¶ 21; ECF No. 23-5, ¶ 16; ECF No. 23-11, pp. 41-44.

Defendants explain that when an inmate is moved to a previously occupied cell the cell is cleaned with a diluted bleach solution by an inmate sanitation worker before the new occupant is allowed to occupy the cell. ECF No. 23-4, ¶ 22.

NBCI inmates that display flu like symptoms are now isolated in place from the population and were initially housed on HU 2-C Tier.  ECF No. 23-5, ¶ 17.  Such inmates are immediately evaluated by medical staff and testing is ordered by medical providers.  *Id*.  According to directives from medical, an inmate with COVID-19 symptoms is placed on isolation until released by a medical order and their cellmate is placed on quarantine.  Where recommended by medical staff an inmate may be transported to a hospital for treatment.  *Id*.  The vehicle used to transport inmates are sanitized between transports.  Removal from isolation or quarantine is based upon the direction of medical staff. *Id*.

On May 11, 2020, July 31, 2020, September 21, 2020, November 9, 2020, and January 6, 2021, NBIC underwent COVID audits.  ECF No. 23-5, ¶ 10; ECF No. 23-11, pp. 46-53.  The audits conducted by a DPSCS team examined 48 different categories including the wearing of PPE, increase in sanitation, and sanitation and medical procedures.  *Id*.  Two audits found one minor deficiency in use of face covering by one inmate and one staff member, which were resolved immediately.  *Id*.  The other three audits had no deficiencies.  *Id*.

Golden was tested for COVID-19 on June 16, 2020, November 19, 2020, and March 17, 2021.  ECF No. 23-5, ¶ 18; ECF No. 23-11, pp. 54-56.  Each test was negative.  *Id*.

2.  Malfunctioning Cell Doors

Defendants also explain that at the time Golden filed his complaint recreation and shower opportunities for inmates on HU 1-A Tier were offered during the 11-7 shift.  ECF No. 23-4, ¶ 23.

On August 5, 2020, Golden asked to be placed on the recreation and shower list.  ECF No. 23-4, ¶ 23.  That same day, at 12:55 a.m., after Golden had completed his recreation and shower time, an alarm went off on the HU 1-A Tier electronic control panel in the control center indicating a malfunction leaving the panel inoperable and unable to operate any of the doors on A-Tier.  *Id.*,

¶24; ECF No. 23-5, ¶ 19.  Inmates that were out of their cells at the time were secured in various locations within HU 1 while the problems were addressed.  *Id*.  Golden was placed in the HU 1-C Tier recreation hall.  ECF No. 23-4, ¶ 24.  The Maintenance Department was immediately contacted by NBCI Operations.  ECF No. 23-4, ¶ 25; ECF No. 23-5, ¶ 20.  Plaintiff was returned to his cell at approximately 7:30 a.m.  ECF No. 23-4, ¶ 26; ECF No. 23-5, ¶ 21.

The malfunction of the control panel required cell doors to be unlocked and locked by the air lock mechanism accessed through a point above the cell door.  ECF No. 23-4, ¶ 26; ECF No. 23-5, ¶ 21.  When NBCI experienced malfunctions of control panels in the past, doors controlled by the panel have unexpectedly opened as the panels cycled on and off.  ECF No. 23-42, ¶ 27; ECF No. 23-5, ¶ 22.  Defendants explain that such unexpected opening of doors can create an emergency situation where multiple doors are opened at once.  *Id*.  While the cell doors had been secured by the access point above the cell door, staff were instructed to secure B-Tier cell doors to the neighboring cell doors that open in opposite directions with leg irons and flex cuffs thus ensuring that if the doors became suddenly unlocked, they could not be opened until staff removed the leg irons or flex cuffs.  *Id*.  Ultimately the flex cuffs were replaced with leg irons, the use of which was reviewed and approved by the Office of the State Fire Marshall on August 10, 2020, with the stipulation that all staff members working in the area were provided keys to unlock the doors in the event of an emergency.  ECF No. 23-4, ¶ 29; ECF No. 23-5, ¶¶ 23- 24; ECF No. 23-11, p. 45.  Temporary repairs were made and the leg irons were removed from the doors by the 11-7 shift on August 13, 2020.  ECF No. 23-4, ¶ 30; ECF No. 23-5, ¶ 25.  Currently HU C and D Tiers are not occupied by inmates due to the need for a permanent repair of the issues that occurred with the HU 1 A and B Tier control panels.  ECF No. 23-5, ¶ 26.

3.  Assignment to Administrative Segregation

Susan Johnson, NBCI Correctional Case Manager, currently assigned to HU 1, avers that at the time of her declaration, Golden was assigned to Administrative Segregation and housed on HU 2-B Tier while repairs were made to the computer system in HU 1.  ECF No. 23-6, ¶¶ 4, 5 (Johnson Decl.); ECF No. 23-7, ¶ 5 (Roderick Decl.); ECF No. 23-Ex 6.  While assigned to HU 2 segregation inmates do not have contact with the general population inmates also assigned to that tier. ECF No. 23-6, ¶ 5.  Because Golden is assigned to Administrative Segregation he is not currently earning Diminution of Confinement Credits.  *Id.*, ¶ 6.  Johnson explains that Golden may be eligible to earn diminution credits once he is assigned to an institutional job.  *Id.*

On February 6, 2019, while housed in HU 2-D Tier Golden was involved in a multiple inmate assault during which he stabbed inmate Edmonds multiple times with a homemade knife. ECF No. 23-6, ¶ 7.  Golden and Edmonds each pled guilty to assault.  *Id.*, ¶¶ 7, 9.  Golden accepted a 60-day segregation term which expired on April 6, 2019.  *Id.*, ¶¶ 7, 10.  Due to Golden's Maximum II security classification, when his disciplinary segregation sentence terminated, he was moved to HU 2-D Tier, and assigned to the sanitation job waiting list.  *Id.*, ¶ 10.  For his part in the affray, Edmonds accepted a 90 day segregation term which expired on May 6, 2019.  *Id.*, ¶ 9. As a result of the assault, Golden and Edmonds were placed on each other's enemy list.  *Id.*, ¶ 8.

Johnson explains that HU2-D Tier is the only Maximum II general population tier.  ECF No. 23-6, ¶ 10.  Due to the verified enemy situation, Edmonds, who is also classified as a Maximum II inmate, was reassigned to Administrative Segregation when his disciplinary segregation term expired on May 6, 2019.  *Id.*, ¶ 11.

On August 1, 2019, Golden was placed on Administrative Segregation as a result of an investigation concerning his possible involvement in planning an assault on staff.  ECF No. 23-6, ¶ 12.  Due to Golden's assignment to administrative segregation, Edmonds was removed from

administrative segregation and placed on HU 2-D Tier and assigned to the sanitation job waiting list. *Id.*, ¶ 13.

On October 28, 2019, Case Management was advised by the NBCI Investigation Division that the investigation was complete and Golden could be considered for removal from administrative segregation. ECF No. 23-6, ¶ 14. Due to the enemy situation with Edmonds, however, Golden remained assigned to administrative segregation. *Id.*

On May 20, 2020, Golden was approved for a reduction in his security status from Maximum II to Maximum I. ECF No. 23-6, ¶ 15. He was scheduled for another security status review in May 2021. *Id.*

DOC 100.0002 "Case Management Manual" provides that inmates assigned to administrative segregation for twelve calendar months will be reviewed by the Commissioner of Corrections or their designees for continued placement on administrative segregation or for placement in an appropriate alternative. ECF No. 23-6, ¶ 16; ECF No. 23-7, ¶ 10. Golden's placement on administrative segregation was reviewed by Commissioner Hill on September 2, 2020, and Hill approved Golden's continuation on administrative segregation. *Id.* Defendants explain that at the time of the filing of their dispositive motion Golden could not be considered for a transfer to a lesser security institution within DPSCS because of his maximum security level status. Further, he could not then be transferred to the other maximum security institutions because those institutions house verified enemies of Golden. ECF No. 23-6, ¶ 17; ECF No. 23-7, ¶ 11. He remained on administrative segregation at NBCI due to a verified enemy in the general population. ECF No. 23-7, ¶ 8.

Richard Roderick, NBCI Correctional Case Management Manager, since 2010, and Warden Nines explain that inmates who pose a risk to the security of the institution or who may

be a danger themselves, including those with verified enemies in general population, are placed on administrative segregation until the threat no longer exists or a suitable housing alternative can be arranged.  ECF No. 23-7, ¶ 6; ECF No. 23-8, ¶ 7.  Roderick and Nines each aver that they rely on staff under their supervision to use their skills, experience, training, and knowledge of case management policies and procedures to make recommendations for inmate classification and assignments and to determine appropriate housing assignments.  ECF No. 23-7, ¶ 7; ECF No. 23-8 ¶ 6. Classification and assignment of inmates are made after taking into consideration the inmate's needs, public safety, and the safety and orderly operation of the facility.  ECF No. 23-7, ¶ 7. Occasionally Roderick may act as the final approving authority for case management recommendation.  *Id*.

Pursuant to DOC 100.0002 "Case Management Manual" inmates assigned to administrative segregation are to be reviewed by a Case Management Team every 30 days.  ECF No. 23-7, ¶ 9; ECF No. 23-8, ¶ 8.  During such reviews the team is to consider available alternatives to the continuation of the assignment to administrative segregation.  *Id*.  Since April of 2020, Case Management Reviews have occurred in absentia due to the risk of COVID-19.  ECF No. 23-7, ¶ 9; ECF No. 23-8, ¶ 8.

Roderick and Nines each aver that to the best of their knowledge, the NBCI Case Management Department has and continues to seek appropriate housing for Golden.  ECF No. 23-7, ¶ 12: ECF No. 23-8, ¶ 9.

4.      Administrative Remedy Procedure

On March 20, 2020, Golden filed ARP-NBCI-0608-20 complaint about the cell searches on March 18, 2020.  ECF No. 23-9, pp. 2, 5-17; ECF No. 23-11, pp. 57, 59-67  He appealed the Warden's response to the Commissioner of Correction.  *Id*.  Thereafter he filed a grievance of ARP

14

NBCI-0608-20, which was received on July 1, 2020 and dismissed on August 6, 2020.  ECF No. 23-10, p. 2.

On June 19, 2020, Golden filed ARP NBCI-1180-20, claiming he was improperly tested for COVID 19 and that the medical department did not follow proper protocols when testing him.  ECF No. 23-11, pp. 57, 68-69.  The ARP was procedurally dismissed on August 18, 2020.  *Id.*, pp. 68-69.  He did not appeal.

Golden filed ARP NBCI-1245-20 on June 28, 2020, complaining about cell searches conducted after he had been tested for COVID-19.  ECF No. 23-11, pp. 57, 70-72.  The ARP was dismissed on procedural grounds on August 18, 2020.  *Id.*  He did not appeal.

Additionally, Golden filed two ARPs in July, two ARPs in September, one ARP in October, one ARP in November, and two ARPs in December, all unrelated to the allegations raised here.  ECF No. 23-11, pp. 57-58.

On September 4, 2019, Golden filed a grievance with the IGO, No. IGO 20191228, complaining that he was placed on administrative segregation on August 1, 2019.  ECF No. 23-10, p. 21.  The grievance was dismissed on October 2, 2019.  *Id.*

**Non-Dispositive Motions**

The Court is also in receipt of Golden's Motions for Preliminary Injunction.  ECF Nos. 27 and 29.  Golden reiterates his claims regarding his assignment to administrative segregation.  ECF No. 27. He notes that he regularly wrote to case administrators regarding his assignment to administrative segregation.  ECF Nos. 27-2 and 29-1.  Additionally, he claims that on June 3, 2021, he was provided paperwork that would allow him to "sign off" on his enemy and thus allow his assignment to general population.  A week later he was advised that he was not permitted to sign off on his enemy and he would remain in administrative segregation.  ECF No. 27-1, p. 2; ECF

No. 29-1, pp. 10-11.

In a supplement to his motions (ECF No. 30), Golden explains that he learned his security level was reduced to medium security and that his enemy, Edmonds, was reassigned to disciplinary segregation and therefore there was no longer a basis for him to be assigned to administrative segregation.  ECF No. 30.

Defendants confirm that Golden was approved for reduction from Maximum I security level to Medium Security on June 29, 2021.  ECF No. 31-1, ¶ 10; ECF No. 31-2, pp. 10-11.  He was then added to the transfer list for transfer to a medium security institution where more opportunities for programming and the ability to earn diminution credits are available.  *Id.*  On July 26, 2021, Golden was transferred from NBCI to Eastern Correctional Institution.  ECF No. 33-1, ¶ 3.  He is assigned to general population and at the time of Defendants' Supplemental Response to Golden's Motions, he was awaiting assignment.  ECF No. 33-1.

In light of Golden's transfer, his request for injunctive relief is moot.  "'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)).  Where developments occur during the course of a case which prevent the Court from being able to grant the relief requested, the claim must be dismissed. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968).  Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained…" *See Lewis v. Continental Bank* Corp, 494 U.S. 472, 480 (1990).  "[O]ne such circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim." *Friedman's Inc. v. Dunlap*, 290 F.3d 191, 197 (4th

Cir. 2002) (citing *Broughton v. North Carolina*, 717 F. 2d 147, 149 (4th Cir. 1983).  The request for injunctive relief is denied as moot.

**Dispositive Motion**

**Standards of Review**

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger*, 510 F.3d at 450.  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. The City of Salisbury, Maryland*, 672 F. App'x. 220, 222 (4th Cir. 2016) (per curiam).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside

the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).

Because he is proceeding pro se, Golden's submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, this Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted.)

## Discussion

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56.  They argue that (1) the Eleventh Amendment bars suit against them in their official capacity; (2) Golden fails to state an Eighth Amendment claim for  denial of medical care or as to his  conditions  of confinement;  (3)  Golden's claims  regarding  his  security classification, access to prison job and programs fails to state a claim; (4) violations of Defendant's policies  and  procedures  does not  state  a due  process claim;  (5)  Golden  failed to  exhaust his administrative remedies as to all claims save the March 18, 2020 cell search; and (6) Defendants are entitled to qualified immunity.

## I.      Official Capacity

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).  The State of Maryland has not waived such immunity for claims brought pursuant to § 1983.  Accordingly, Defendants are immune from suit for actions taken in their official capacity.

## II.     Exhaustion

Defendants  contend  that  Golden's  Complaint  is  subject  to  dismissal  pursuant  to  the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e, because his claims have not been properly presented through the administrative remedy procedure.  The PLRA provides in pertinent part that:

19

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

A claim that has not been exhausted pursuant to the PLRA may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules[.]" *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). The Supreme Court has stated that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 578 U.S. 1174, 136 S. Ct. 1850, 1859 (2016) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase v. Peay*, 286 F. Supp. 2d 523, 529-30 (D. Md. 2003). Exhaustion is also required even where the specific relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741. As a prisoner, Golden is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (noting that no distinction is made with respect to exhaustion requirements between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee.  Md. Code Ann., Corr. Servs. ("CS") § 10-206(a).  However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional Administrative Remedy Procedure ("ARP") process, before filing a grievance with the IGO. *See id.* § 10-206(b). DPSCS has made an ARP available to Maryland State prisoners for "inmate complaint resolution." *See generally id.*

§§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining ARP). Thus, before filing a grievance with the IGO, a prisoner is required, among other things, to make an initial request for an administrative remedy with the Warden. *Id.* 12.07.01.04(B)(9)(a). If an ARP is filed and denied, the prisoner may appeal the denial within 30 days to the Commissioner of Correction.

If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within 30 days. C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii).

The ARP process does not apply to case management decisions, which are to be directly grieved to the IGO. COMAR 12.02.28.04(B)(1); 12.07.01.04(B)(9)(c). Here, Golden did not timely and properly exhaust the grievance process as to each of his claims. The only claims he fully and properly exhausted are in regard to: (1) the March, 2020 cell search, as to which Golden filed an ARP and pursued to the IGO, and (2) his complaint that he was placed on administrative segregation on August 1, 2019,  as to which he filed a grievance directly to the IGO as required.

Ordinarily a prisoner must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review

process in accordance with the applicable procedural rules, including deadlines." *Woodford*, 548 U.S. at 88, 93. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Moore*, 517 F.3d at 725.

Plaintiff states that he did not attempt to pursue administrative remedies as to his other claims because no ARP forms were available while he was housed on segregation.  His contention is belied by the record given that he completed the full ARP process as to the March cell search and filed other ARPs while on administrative segregation.  The record does not support a finding that the grievance procedure was unavailable to Golden.  Defendants provide documentation of ten other ARPs filed by Golden from June to December, 2020 (ECF No. 23-11, pp. 57-58) as well as grievances to the IGO filed in July.  ECF No. 23-10.  This negates Golden's claim that ARP forms were unavailable in his housing area to allow him to timely pursue administrative remedies.

Nothing reflects that Golden fully pursued administrative remedies prior to filing this complaint or that he was prevented from doing so, as to each of his claims except the March 2020 cell search and his August 2019 assignment to administrative segregation. Golden's remaining claims concerning violation of Defendants' own policies, malfunctioning cell doors, and COVID protocols unrelated to the March 2020 cell search, are, therefore, unexhausted and are dismissed without prejudice.  An analysis of the March 2020 search and the August 2019 assignment follow.

**III.    March 2020 Cell Search**

Golden contends that Defendants failed to employ sufficient safety protocols during the March, 2020 search of his cell.  The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  An official is liable under the Eighth Amendment if he acts with "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To satisfy the deliberate indifference standard, a plaintiff must demonstrate first, that the alleged deprivation is, objectively, sufficiently serious, and second, that subjectively, the prison official acted with a sufficiently culpable state of mind.  *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

An official violates the Eighth Amendment rights by exposing an inmate to conditions that pose "a substantial risk of serious harm" to their health.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks and ellipses omitted).

The Eighth Amendment "protects against future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Constitutional violations could arise from "the exposure of inmates to a serious, communicable disease" even if "the complaining inmate shows no serious current symptoms" and "even though the possible infection might not affect all those exposed."  *Id.*  "This includes confinement conditions that are 'very likely to cause serious illness and needless suffering' by 'exposure of inmates to [the] serious, communicable

23

disease' of COVID-19." *Seth v. McDonough*, Civil Action No. PX-20-1028; 2020 WL2571168 *10 (D. Md. May 21, 2020) (examining conditions in the context of pre-trial detainees).

COVID-19 is a highly contagious disease that is potentially fatal, especially for individuals in high risk categories. There is no dispute that Defendants are and were aware of the risks associated with COVID-19; whether Defendants disregarded the substantial risk posed by COVID-19 during the March 2020 cell search is the issue presented.

The subjective component of an Eighth Amendment claim requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 307 (4th Cir. 2004). An official who knows of a substantial risk to inmate health of safety may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014).

The record demonstrates that at the time of the March 18, 2020 cell search, no directives had been promulgated at the State or prison level requiring the use of PPE in response to the COVID-19 pandemic. ECF No. 23-4, ¶ 10; ECF No. 23-5, ¶ 6. Correctional staff searching Golden's cell complied with all then existing standards for the search. As measures to fight COVID-19 evolved, the record clearly demonstrates that NBCI adopted and implemented them.

The day of the cell search DPSCS began to provide "Operation Updates" to staff regarding adjustment to operations due to the COVID-19 pandemic. ECF No. 23-4, ¶ 9. On March 23, 2020,

DPSCS staff received an Operational Update stating that employees were not allowed to report to work wearing a mask and that PPE was to be utilized only for quarantine and isolation. ECF No. 23-4, ¶ 11; ECF No. 23-11, p. 15.

As of March 20, 2020, correctional staff are required to practice social distancing at all times while at work.   ECF No. 23-5, ¶ 9.   On March 31, 2020, that DPSCS Directive EMD.DPSCS.055.0012 "Covid-19 Utilization of Protective Equipment and Additional Levels of Protection" regarding the standard use of PPE was made effective.  ECF No. 23-4, ¶ 12; ECF No. 23-5, ¶ 7; ECF No. 23-11, pp. 16-21.  Shortly after this directive issued, all staff were issued PPE and directions for its proper use.  ECF No. 23-4, ¶ 12.  It was not until April 15, 2020, effective April 18, 2020, that the Governor issued an Executive Order requiring members of the public wear face coverings in certain designated circumstances.

In April 2020, inmates were also required to wear facemasks and Golden was provided facemasks.  Audits were conducted and the reports indicate that all required measures are in place. Additionally, NBCI began isolating and quarantining COVID-19 inmates, and others, and testing the entire prison population.   Defendants took appropriate measures to lessen the risk of transmission of COVID-19 among inmates and staff.   Defendants responded reasonably and quickly to the challenges presented by the COVID-19 pandemic.  Based on the evidence before the Court Defendants are entitled to summary judgment on this claim.

## IV.    August 2019 Assignment to Administrative Segregation

Golden complains about his assignment to and retention on administrative segregation. Golden was placed on administrative segregation while he was investigated regarding security concerns in the institution.  After the investigation was completed and it was determined he could be returned to general population, he was unable to be so returned due to his security classification

coupled with his having an enemy in the general population.  Golden's complaints that he has been deprived of due process due to his assignment and retention on administrative segregation are unavailing.

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of ... liberty ... without due process of law."  To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest.  *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  A plaintiff may bring a civil action to redress due process violations under 42 U.S.C. § 1983.  In the prison context there are two different types of constitutionally protected liberty interests that may be created by government action.  The first is created when there is a state created entitlement to an early release from incarceration.  *Board of Pardons v. Allen*, 482 U.S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state created liberty interest in good conduct credits).  The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Wilkinson v. Austin*, 545 U.S. 209 (2005).  As the Fourth Circuit noted, "[t]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions…."  *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise.  *Beverati v. Smith*, 120 F.3d 500, 502-3 (4th Cir. 1997); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration.") (alteration in original) (internal quotation marks

omitted).

*Wilkinson*, 545 U.S. 209, involved transfer to and housing in the isolated confinement of a "supermax" facility. *Id*. at 213. It also involved solitary confinement-- isolated human contact for potentially "indefinite" periods. *Id*. at 224. The Court recognized that the severe deprivations detailed in that case exist in most solitary confinement facilities and looked at the presence of added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it. *Id*. at 224. These factors were (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement. *Id*. The Supreme Court said: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id*. Therefore, such prisoners have a protected liberty interest in avoiding placement in such confinement. *Id*.

The Fourth Circuit has explained: "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto*, 780 F.3d at 250. Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations combined with . . . harsh and atypical conditions" for Due Process protections to apply. *Id*. (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25).

"[T]he general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015). Where conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population," no liberty interest exists in avoiding that segregation assignment. *Bevarati*,

120 F.3d at 503.  But, for an inmate sentenced to death and on death row, as in *Prieto*, 780 F.3d 245, "using the general population to gauge the ordinary incidents of prison life . . . was improper." *Incumaa*, 791 F.3d at 528 (citing *Prieto*, 780 F.3d at 252-54). Although the nature of a prisoner's conviction and the length of his sentence do not give rise to differing liberty interests, "'state law mandates [regarding] the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence . . . are, by definition, the ordinary incidents of prison life for such offenders.'"  *Id*. (quoting *Prieto*, 780 F.3d at 254) (alterations in *Incumaa*).  As a prisoner, Golden is not entitled to the process due to persons who remain at liberty.  "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all."  *Wilkinson*, 545 U.S. at 225.

Golden seemingly contends that his inability to earn diminution of confinement credits while he was housed on administrative segregation is the basis of his due process claim.  But there is no constitutional right for an inmate prisoner to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution, nor does a prisoner have a right to participate in a particular program.  *See Sandin*, 515 U.S. at 484 (concluding that protected liberty interests are generally limited to freedom from restraint which imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life); *McKune v. Lile*, 536 U.S. 24, 26 (2002) (stating the "decision where to house inmates is at the core of prison administrators' expertise"); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the Constitution's Due Process Clause does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system"); *see also Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Rizzo v. Dawson*, 778 F. 2d 527, 530 (9th Cir. 1985).

Matters of security classification are reserved to the sole discretion of prison officials. *See Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994). In analyzing conditions of confinement, the court must consider a correctional system's need to maintain order, discipline, and control. *See Sandin*, 515 U.S. at 483-84 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"); *see also Wolff*, 418 U.S. at 558–62. In sum, this Court is unaware of any Maryland law or regulation conferring a protected liberty interest on DOC inmates that has been abridged here. Absent a protected liberty interest, a Plaintiff cannot successfully claim that his due process rights were violated, because "[p]rocess is not an end in itself." *Olim*, 461 U.S. at 250. Reviewing Plaintiff's allegations in the light most favorable to him, there are no genuine issues of disputed material fact and Defendants are entitled to summary judgment in their favor as a matter of law.

## Conclusion

Accordingly, Golden's pending motions ARE DENIED. Golden's claims concerning violation of Defendants' own policies, malfunctioning cell doors, and COVID protocols unrelated to the March 2020 cell search, ARE DISMISSED without prejudice for failure to exhaust administrative remedies. Defendants' Motion for Summary Judgment IS GRANTED as to Golden's claims regarding the March 2020 cell search and his August 2019 assignment to administrative segregation.[2]

A separate Order follows.

 November 17, 2021           _____/s/_____
          Date                          RICHARD D. BENNETT
                                     UNITED STATES DISTRICT JUDGE

---

[2] In light of the Court's ruling, an analysis of the Defendants' remaining arguments, including their defense of qualified immunity is not necessary.